IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 12, 2015 Session

## ROBERT GUERRERO v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County
No. 17884     Stella Hargrove, Judge**

---

**No. M2014-00348-CCA-R3-PC – Filed July 23, 2015**

---

The petitioner, Robert Guerrero, appeals the denial of post-conviction relief from his 2008 Maury County Circuit Court jury convictions of first degree murder, attempted first degree murder, and aggravated assault, claiming that he was denied the effective assistance of counsel and that the post-conviction court erred by excluding witness testimony and by exhibiting bias.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Andrew B. Love (on appeal and at hearing), Nashville, Tennessee, and John M. Schweri (at hearing), Columbia, Tennessee, for the appellant, Robert Guerrero.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Michel Bottoms, District Attorney General; and Kimberly Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The evidence at the petitioner's jury trial revealed that, on April 12, 2008, a fight erupted during a "Quinceanera, 'Sweet 15' birthday party, at the National Guard Armory in Columbia, Tennessee." *State v. Robert A. Guerrero*, No. M2008-02839-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Nashville, June 8, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011).  Law enforcement officers "were called to the scene and people were escorted out of the building." *Id.*  Witnesses placed the petitioner at the party during the fracas. *Id.*  One of the victims, Jose Castro, left the party and drove away in his Ford Expedition, in which 10 others were passengers, including Mr. Castro's

girlfriend, Sarah Garcia; Ms. Garcia's sister, Patricia Garcia; and Mr. Castro's 10-year-old brother, Juan Castro. *Id.*

On the way home, Mr. Castro noticed that the vehicle behind him was repeatedly speeding up and slowing down. The driver of the car following him then turned off the headlights. Mr. Castro told everyone in his vehicle to duck down because the "car behind [him] was acting suspicious." He testified that the car pulled up beside him and he heard gunshots. Mr. Castro testified that it was too dark for him to see the color of the vehicle or the people inside. He "just saw sparks." Mr. Castro was shot in his upper thigh and his "body went numb." He began "swerving and hitting the car to run it off the road." The other driver appeared to have lost control of his vehicle. Mr. Castro drove to the Williamson County Medical Center. He testified that on their way to the hospital, Sarah Garcia told him that she had been shot in the leg, and Juan Castro said that he had been "hit."

. . . .

Emergency room physician Dr. Jerry Edwards testified that when the victims arrived at the Williamson County Medical Center in the early morning hours of April 13, 2008, he helped Sarah Garcia out of the vehicle. She was bleeding profusely from her left leg. Juan Castro and Patty Garcia were brought into the hospital in full cardiac arrest. Patty Garcia had been shot in the head, and Juan Castro had been shot in the chest. Both victims died. Dr. Edwards also treated Jose Castro, who had been shot twice in his leg.

Forensic pathologist Amy McMaster performed the autopsies on Patty Garcia and Juan Castro. She testified that Patty Garcia died from a gunshot wound to her head. Juan Castro had three gunshot wounds, two to his back and one to his shoulder. Two bullets were recovered from Mr. Castro's shoulder and chest. A third bullet that had entered Mr. Castro's back and then exited his chest was not recovered but it produced the fatal wound.

*Id.*, slip op. at 2-3. Columbia Police Department Officer Jeremy Humphrey arrived at the scene of the shooting to find the petitioner and "another male standing beside a vehicle that was in the ditch." *Id.*, slip op. at 3. The petitioner told the officer that "they had been in a fight at the Armory" and that a sport utility vehicle "had run them off the road." *Id.*, slip op at 3-4. Officer Alex McPherson recovered an "'SKS' assault rifle with a collapsible stock" lying near the petitioner's vehicle, and the petitioner and the other man were placed under arrest. *Id.*, slip op. at 4.

> Detective Jeremy Alsup interviewed [the petitioner] at the police department on April 16, 2008. Detective Alsup testified that [the petitioner] also gave a written statement in which he denied having been involved in a fight at the Armory. [The petitioner] stated that one of the victims had approached him and tried to hit him and that [the petitioner] and his two friends were escorted out of the party by police. They waited outside with another friend and then left together. After leaving, he saw the victim's vehicle, and he stated that he handed "Chas" a .38 handgun and that "Chas" passed "Bodie" the SKS out of the trunk, and when they got beside them, "they opened fire." The vehicle then wrecked, and "Bodie and Chas" ran, and [the petitioner] and his cousin stayed at the scene. In his statement, [the petitioner] admitted "I understand what we did was wrong, but all I can do is pray and beg for another shot at life and to let me take care of my family, please. I am not a murderer."

*Id.*

A corrections officer located a letter in co-defendant Javoris Sparkman's cell, and, following analysis by a Federal Bureau of Investigation forensic handwriting examiner, the "'overwhelming majority'" of the letter was determined to have been written by the petitioner. *Id.*, slip op. at 4-5. The letter stated as follows:

> You got me f[ ]ed up bro, I didn't even want to give no statement until I talked to a lawyer that's why they kept me in the front, so I couldn't talk to little Eric and get our sh[ ] together. You act like you got away and I told on you. We left the damn chopper right next to the car. Me and E stayed looking for the gun. When they pulled up on us after you turned yourself in they questioned me and I tried to lie and

say we were taking E home to the creek. And they hit us first before we started dumping, but they already knew everything from me giving Chase the gun to me saying light them up. As I started to speed up I didn't say sh[ ]. So f[ ]k what you talking about. That's some ho-a[ ]-sh[ ] for you to think like that after everything. I f[ ]ed with you fool, but f[ ]k it, I guess you can think what you want.

*Id.*, slip op. at 4-5.

Detective Cory Cooper testified that, in processing the crime scene, he never recovered a .38 caliber handgun. *Id.*, slip op. at 5. Detective Cooper testified that "there were no weapons found in the victim's vehicle" and that orange-colored paint chips collected from the vehicle the petitioner was driving were consistent with the color of the victim's vehicle. *Id.* Tennessee Bureau of Investigation ("TBI") Agent Steve Scott examined the rifle found at the crime scene and determined that "the bullet recovered from Sarah Garcia had been fired from the rifle" but that the bullets recovered from the bodies of Juan Castro and Patricia Garcia had been "fired from a .38 caliber handgun." *Id.*, slip op. at 5-6. TBI Agent Mark Dunlap "compared DNA profiles collected from the rifle found at the scene with [the petitioner's] DNA sample" and determined that the petitioner "was a 'major contributor' in that his DNA was found in the highest levels on the grip of the rifle." *Id.*, slip op. at 6. Additionally, Agent Dunlap determined that the petitioner "was a 'minor contributor' to the forearm and strap of the rifle." *Id.*

The petitioner testified that he and co-defendants Javoris Sparkman, Charles Kelly, and Eric Guerrero attended the birthday party together; the petitioner stated that the group arrived at the party "earlier that night and left, and after they returned, they were not there long before the party broke up." *Id.* The petitioner testified that, when they returned to the party, "'it looked like a riot.'" *Id.* The petitioner testified that his grandfather had been struck in the mouth but that he did not see the attacker. *Id.* After law enforcement officers arrived on the scene, the petitioner was attempting to leave "when someone from the victim's family tried to grab him," and Mr. Sparkman "grabbed that person and told him to 'chill out' and 'back up.'" *Id.* At that point, officers escorted the group out of the party and instructed them to leave. *Id.*

[The petitioner] testified that he did not know any of the victims before that night. [The petitioner] was told that one of the victims had hit his grandfather. [The petitioner] saw the victims leave in Mr. Castro's Ford Expedition, and he

- 4 -

pulled away behind them. [The petitioner] was driving, Chas was in the back passenger seat, Javoris Sparkman was in the front passenger seat, and Eric Guerrero was behind the driver's seat. He testified that they caught up to the victims' vehicle and pulled up beside it. He testified that he "wasn't in [his] right mind" because of what he had seen happen to his grandfather. [The petitioner] was carrying a .38 caliber revolver "on [him]" and that he had an SKS assault rifle in his trunk, but he did not know who the rifle belonged to. [The petitioner] claimed that he did not know why the rifle was in his trunk, but he was the only one who knew it was there. He testified that as they followed the victims' vehicle, he and his co-defendants did not discuss what they were going to do because "it was understood what was going on." As they pulled up to the victims' vehicle, [the petitioner] told the others that there was a rifle in the trunk. [The petitioner's] vehicle had a pass through between the trunk and the back seat. Someone in the back seat passed the rifle to the front, and [the petitioner] gave his .38 to Chas because, he testified, Chas asked for it.

[The petitioner] testified that he did not know how many people were in Mr. Castro's vehicle. He testified,

> We didn't think that there was that many people in the vehicle, . . . . We just seen bald heads jumpin' in there. We seen the guys that was involved in the fight. We didn't seen none of them, all the women that was in the vehicle. I mean, if we would have known there was all them women in the vehicle, I mean, come on, you know, I mean, you can't, it wouldn't have happened the way, you know, it was all messed up. That was all wrong.

[The petitioner] admitted that he wrote the letter to Javoris Sparkman, and he admitted that he had lied to detectives about the events of that night. He testified that he did not remember telling anyone to "light 'em up," and he thought that phrase had been "put in his head" by the

- 5 -

detectives. [The petitioner] denied that he shot any of the victims. [The petitioner] testified, however, that he sped up in order to keep up with the victim's vehicle and that Sparkman and Charles Kelly fired upon the vehicle.

*Id.*, slip op. at 6-7.

Based on this evidence, a Maury County Circuit Court jury convicted the petitioner of two counts of first degree premeditated murder, two counts of first degree felony murder, nine counts of attempted first degree premeditated murder, and four counts of aggravated assault. *Id.*, slip op. at 1. After merging the murder convictions and merging the aggravated assault convictions with the attempted first degree murder convictions, the trial court imposed an effective sentence of two consecutive life sentences plus 135 years, and this court affirmed the judgments on direct appeal. *Id.*

On September 10, 2012, the petitioner filed, pro se, a timely petition for post-conviction relief. Following the appointment of counsel and the amendment of the petition, the post-conviction court held an evidentiary hearing on January 15, 2014.

Trial counsel testified that he had practiced law for close to 22 years and that he had been involved in "between two and three dozen" death penalty cases. Trial counsel testified that he represented the petitioner at trial and on direct appeal. Trial counsel estimated that he met with the petitioner "a half dozen times" between June 2, 2008, and November 10, 2008, when the petitioner's jury trial began.

Trial counsel acknowledged that he did not hire an investigator but explained that he did not believe that investigative services were necessary in this case. Trial counsel explained that, due to the judicial district's open file policy, he was privy to all of the discovery materials, which totaled 577 pages. Trial counsel conceded that the petitioner "didn't testify particularly well." With respect to the petitioner's testimony, trial counsel stated that he had emphasized the importance of the petitioner's conveying his anger over the injury to his grandfather and that he was puzzled that the petitioner did not properly convey this point during his trial testimony. Trial counsel testified that the petitioner's responses during his direct examination testimony were "stunning," expounding that "the way [the petitioner] talked on the stand was foreign to the way we had talked before," given how "very articulate" and "on top of" the case the petitioner was during trial preparation. Trial counsel admitted that he did not interview any of the birthday party attendees, and counsel could not recall whether he had spoken to the petitioner's grandfather. Trial counsel moved to exclude any reference to gangs or gang activity, which motion was granted by the trial court.

- 6 -

When asked to give the primary reason for the petitioner's testifying at trial, trial counsel answered as follows:

> From a legal perspective, my recollection is that we needed – we needed this information out about his uncle [sic] and that it upset him.
>
> Because my view was, if we could get this down to a voluntary manslaughter type situation, where, you know, he's doing something; he's acting irrationally, based on something that occurred.
>
> . . . .
>
> His grandfather had been assaulted and he was – right, wrong, or indifferent, he was upset over it and that these series of events occurred as a result of that.
>
> Now, really, the only way you're going to get that out in most cases is for the [d]efendant to get up here and say, "This is how I was feeling."
>
> . . . .
>
> And when it comes to putting the defendant[] up, ultimately, it's the [d]efendant's choice and we talked about it.
>
> . . . .
>
> But from a defense perspective, it was a pretty tough case to defend against. And my recollection is the situation with his grandfather was the best piece of information I had, that I could do something with to limit his involvement, or minimize it, mitigate it.
>
> . . . .

. . . I don't recall any other information that would have been able to do what you're talking about, to tell what the [petitioner] is thinking, what's going on through his mind, with respect to his grandfather other than the [petitioner] in this case.

Trial counsel was adamant that he "did not force [the petitioner] to testify" but acknowledged that he likely encouraged the petitioner to testify because "that was the best shot of a defense that we had with this case."

Susan Jaime, the petitioner's aunt, testified that she was present at the Quinceanera when the fight began. She noticed that her father, Augustine Guerrero, who is the petitioner's grandfather, had blood on his face. Ms. Jaime conceded that Mr. Guerrero was not seriously injured; although "he had a lot of blood on his face," he only sustained a busted lip. As Ms. Jaime was attending to Mr. Guerrero, the petitioner approached and asked what had happened. Ms. Jaime responded that she did not know and that "[s]omebody hit" Mr. Guerrero, though she did not see it happen. The petitioner was "trying to find out who hit" Mr. Guerrero, but Ms. Jaime told the petitioner that her father was fine and that the petitioner should "[j]ust go home." A few minutes later, Ms. Jaime saw the petitioner leave the party. Ms. Jaime described the petitioner as "very angry" and "escalated." Ms. Jaime testified that someone other than trial counsel had asked if she was willing to testify on the petitioner's behalf, and she had responded, "'Absolutely.'"

The petitioner testified that trial counsel met with him about "three hour[s] total" and that trial counsel never adequately prepared him to testify. The petitioner believed that his testimony at trial was unnecessary because trial counsel could have used Ms. Jaime, Mr. Guerrero, and "so many others" to establish the petitioner's state of mind following the injury to Mr. Guerrero. The petitioner stated that he informed trial counsel that he did not want to testify but that trial counsel told him "if [he] didn't testify [they] couldn't present that theory of the case" and that the petitioner's testimony was "the only way [they] can introduce that type of evidence." The petitioner admitted that he had stated at trial that he was "an accessory to murder" and admitted that he was driving the vehicle when the shooting occurred, but the petitioner insisted that he did not understand the law of criminal responsibility. The petitioner agreed that he was "pretty nervous" when he testified at trial and opined that his nervousness was "misinterpreted" by the jury.

With this evidence, the post-conviction court denied relief, specifically accrediting trial counsel's testimony over that of the petitioner:

> Petitioner was provided by the [c]ourt with a highly skilled trial lawyer and one of the best in our judicial district. With some 22 years of trial practice, [trial counsel] is the most experienced criminal defense lawyer in the district. He has been involved in some two to three dozen capital cases, and has defended five defendants charged with capital murder. The Court has always found [trial counsel] to be an honest person of great integrity; he knows and understands each and every aspect of the case; he knows the law; and he zealously represents his clients.
>
> . . . .
>
> The [c]ourt does not find [p]etitioner to be credible. He is a desperate man who blames others for his lot in life. He blames law enforcement for putting words in his mouth when he is the one who asked to talk to law enforcement when taken into custody; he blames [trial counsel] for his taking the stand and making a mess of his testimony; and he blames the criminal justice system for two consecutive life sentences plus 135 years for convictions resulting from his ordering the execution of innocent victims.

The post-conviction court noted trial counsel's decision to "mitigat[e] liability by showing strong provocation on the part of petitioner relative to the perceived injuries to his grandfather" and stated that it "does not question trial strategy." In concluding that the petitioner had "failed to carry his burden of proof" and denying the petition for post-conviction relief, the court opined that the petitioner "had the privilege of being represented by an outstanding defense attorney . . . who is skilled in the law and . . . goes to great lengths to protect the rights of his clients."

On appeal, the petitioner reiterates his claim of ineffective assistance of counsel. In addition, the petitioner argues that the post-conviction court erred by refusing to allow a particular witness to testify and by exhibiting bias toward the petitioner. We will address each claim in turn.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of

Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

## I. Ineffective Assistance

The petitioner first contends that trial counsel was ineffective by relying on the petitioner's trial testimony to establish his state of mind prior to the shooting and by failing to adequately prepare the petitioner to testify.

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and

fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the trial court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record overwhelmingly supports the post-conviction court's denial of relief. With respect to trial counsel's decision to urge the petitioner to testify on the basis that the petitioner's testimony – and his testimony alone – was necessary to advance the defense of strong provocation, such a tactical decision was clearly made after adequate preparation on the part of trial counsel, and we will not second-guess this reasonable trial strategy. *See Adkins*, 911 S.W.2d at 347. Moreover, the petitioner failed to establish that trial counsel did not adequately prepare the petitioner for his trial testimony. The evidence does not preponderate against the post-conviction court's finding that the petitioner is "very intelligent"; that the petitioner's claim that he failed to understand the meaning of criminal responsibility was "disingenuous"; and that the petitioner "made a terrible witness" despite trial counsel's "discuss[ing] at length" his trial strategy. As such, we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

## *II. Exclusion of Witness Testimony*

The petitioner next contends that the post-conviction court erred by refusing to allow Detective Jeremy Alsup to testify at the hearing. When questioned by the post-conviction court as to the relevance of Detective Alsup's testimony to the claim of ineffective assistance of counsel, post-conviction counsel explained that he wished to question the detective about whether the petitioner actually made the statement, "Light them up" just prior to the shooting. Although his argument was somewhat convoluted, it appears the petitioner maintained that this testimony was necessary to further demonstrate trial counsel's lack of preparation in the case. The post-conviction court found the petitioner had waived the issue for failure to raise it in his petition for post-conviction relief.

We are unable to review the lower court's exclusion of this testimony because the petitioner failed to make an offer of proof. As our supreme court has observed, "In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner." *State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986). Without Detective Alsup's testimony, it is impossible to conduct a meaningful review of this issue. *See State v. Hall*, 958 S.W.2d

679, 691 n.10 (Tenn. 1997) ("Not only does [an offer of proof] ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded."); *see also* Tenn. R. Evid. 103. Accordingly, the petitioner has waived this issue.

## *III. Bias*

Finally, the petitioner argues that the "post-conviction court is biased against [the petitioner] and this court should order that another judge hear this case on remand." The petitioner bases his argument on the post-conviction court's referring to the petitioner as "a desperate man" in its order denying post-conviction relief and on the court's statement that it would refrain from ruling on allowing the testimony of Detective Alsup at the hearing "until [the court] heard from" the petitioner.

First, the petitioner, in his sparse, single-paragraph argument, utterly failed to support his argument with citation to relevant authorities, and thus, he has waived our consideration of this issue. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on"); Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Second, the petitioner has further waived our consideration of this issue by failing to timely raise it via a motion to recuse. Tennessee Supreme Court Rule 10B provides that a party seeking recusal or disqualification of a judge "shall do so by a timely filed written motion," supported by an affidavit and alleging with specificity the grounds for the motion. Tenn. Sup. Ct. R. 10B § 1.01. "'[R]ecusal motions must be filed promptly after the facts forming the basis for the motion become known, and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality.'" *State v. Antonio Freeman*, No. M2012-02691-CCA-10B-CD, slip op. at 5-6 (Tenn. Crim. App., Nashville, Jan. 15, 2013) (quoting *Duke v. Duke*, 398 S.W.3d 665, 670 (Tenn. Ct. App. 2012)).

In any event, adverse rulings by a trial court do not, standing alone, establish judicial bias requiring recusal of the trial court. *See, e.g., Herrera v. Herrera*, 944 S.W.2d 379, 397 (Tenn. Ct. App. 1996). The reference to the petitioner as a "desperate man who blames others for his lot in life" spoke to the post-conviction court's assessment of the petitioner's lack of credibility. With respect to the post-conviction

court's statement that it would make a decision regarding the admission of Detective Alsup by "keep[ing] an open mind until I hear from" the petitioner in no way indicates bias and avails the petitioner nothing.

*Conclusion*

The petitioner failed to establish that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE